## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| JOHN RAGAN, | : | |
| | : | |
| Plaintiff, | : | Civil Action No. |
| | : | 05-2825 (NLH) |
| v. | : | |
| | : | |
| GERALDO FUENTES AND THE | : | **OPINION** |
| BOROUGH OF WOODLYNNE | : | |
| | : | |
| Defendants. | : | |
| | : | |

**APPEARANCES:**
F. MICHAEL DAILY, JR.
SENTRY OFFICE PLAZA
216 HADDON AVENUE
SUITE 100
WESTMONT, NJ 08108
*Attorney for Plaintiff John Ragan*

ILA BHATNAGAR
MCDONNELL & ASSOCIATES
500 MARLTON PIKE WEST
CHERRY HILL, NJ 08002
*And*
WILLIAM M. TAMBUSSI
BROWN & CONNERY, LLP
360 HADDON AVENUE
PO BOX 539
WESTMONT, NJ 08108
*Attorneys for Defendant Mayor Fuentes and the Borough of Woodlynne*

**HILLMAN**, District Judge

       This case involves a long-running dispute between the

defendant mayor and the plaintiff chief of police of the Borough

of Woodlynne ultimately resulting in the elimination of the

position of chief of police by the defendants followed by

plaintiff's resignation.  Plaintiff brought claims for violation
of his first and fourteenth amendment rights pursuant to 42
U.S.C. § 1983, and for violation of the New Jersey Conscientious
Employee Protection Act ("CEPA"), N.J.S.A. 34:19-1, et seq.
Defendants moved for summary judgment seeking dismissal of
plaintiff's complaint in its entirety.  For reasons explained
below, defendants' motion is granted in part and denied in part.


## I.  BACKGROUND

Plaintiff John Ragan was hired in 1979 by the Borough of
Woodlynne as a police officer.  He was promoted to chief of
police in 1986 and served in that position until June 1, 2004.
Defendant Geraldo Fuentes[1] served on Council for the Borough of
Woodlynne for ten years before being elected Mayor in November
2003.  While on Council, Fuentes served as chairman of public
safety and worked closely with Ragan.  In that capacity, Ragan
alleges that Fuentes instructed that a certain Hispanic candidate
be placed in the next special police academy class.  Ragan
refused to follow the instruction.  Also discussed while Fuentes
served on Council was the idea to eliminate the Woodlynne chief
of police position and merge the Woodlynne police department with
the Collingswood police department.

---

[1]   Although named as "Geraldo" Fuentes in the complaint,
other spellings of the Mayor's name appear as Jeraldo Fuentes.

Mayor Fuentes took office on January 1, 2004.  Ragan alleges that on January 14, 2004, the Mayor requested that a specific Hispanic police officer be assigned two special functions.  Ragan refused to make the assignment on the ground that it would raise issues of scheduling, seniority and overtime.  On January 23, 2004, Ragan alleges that the Mayor met with a prosecutor and a lieutenant over a parking ticket issued to a Hispanic female.  Ragan maintains that the Mayor instructed the lieutenant to dismiss the ticket.  Ragan later approached the Mayor and told him he should not have instructed that the ticket be dismissed.  The Mayor and Ragan also had a difference of opinion over the scheduling of officers.  Ragan asserts that the Mayor sent memos on January 27, 2004, directly to the officers instructing them on when they could and could not leave town.  Ragan addressed Council and the Mayor stating that such memos should not be distributed directly to the officers but should be brought to the attention of Ragan as chief of police.  Mayor Fuentes disagreed and stated that he wanted Ragan to work two to three hours on street patrol.  Ragan declined to do so on the ground that his administrative duties took up too much of his time to patrol the streets.

While disputes between the Mayor and Ragan were ongoing, the Borough solicitor was asked to review "certain issues relative to the demarcation of lines of authority between the Police Chief

3

and the Borough."  In response, the solicitor sent a twelve page letter dated February 6, 2004, to the Mayor and to members of Council regarding the duties of the police chief.  The solicitor concluded: (1) that the Borough cannot order the chief of police to patrol since it would likely be a demotion in violation of the Tenure Act and the "Police Chiefs Responsibility Law"; (2) that the Borough can require periodic/monthly reports from the chief; and (3) that the Borough can curtail volunteer activities of the chief if they are interfering with official duties.

On March 11, 2004, a motion was passed by Borough Council, later passed as an ordinance on May 11, 2004, abolishing the position of chief of police, and creating the position of director of public safety/chief law enforcement officer.  Under the ordinance the director/chief became responsible for the administrative duties of the police department.  The effect of the ordinance was to retain Ragan as the highest ranking member of the police department without a decrease in compensation. However, his title changed from chief of police to lieutenant.

Following passage of the ordinance abolishing his position, Ragan submitted his resignation on May 14, 2004, effective June 1, 2004, and retired with full pension and benefits.  Ragan maintains that he was not advised of his right to a hearing regarding his employment.  Ragan denies that Mayor Fuentes was concerned about safety due to too few police patrolling the

4

Borough, or that residents had complained to the Mayor about lack of police presence.  Ragan also denies that the reason the Mayor presented the ordinance to Council creating the position of public safety director and eliminating the position of chief of police was in response to Ragan's being unable to patrol the streets due to his administrative duties.

Almost two years later on July 3, 2006, the entire Woodlynne Police Department was dissolved and taken over by the Collingswood Police Department.  It is defendants' position that the decision to dissolve the department was made based on their concern for safety and financial responsibilities and the recognition that Collingswood had a bigger police force and could provide greater security.

Ragan filed a complaint alleging that defendants violated his right to free speech protected by the first amendment and violated his due process rights protected by the fourteenth amendment.  Ragan also asserts that defendants violated CEPA and requests punitive damages.  Defendants filed for summary judgment seeking to dismiss Ragan's complaint.  Defendants' summary judgment motion is presently before the Court.

## II.  **DISCUSSION**

### A.  **Summary Judgment Standard**

Summary judgment is appropriate where the Court is satisfied that "the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any, show
that there is no genuine issue as to any material fact and that
the moving party is entitled to a judgment as a matter of law."
Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986); Fed. R. Civ.
P. 56©.

An issue is "genuine" if it is supported by evidence such
that a reasonable jury could return a verdict in the nonmoving
party's favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242,
248 (1986).  A fact is "material" if, under the governing
substantive law, a dispute about the fact might affect the
outcome of the suit.  Id.  In considering a motion for summary
judgment, a district court may not make credibility
determinations or engage in any weighing of the evidence;
instead, the non-moving party's evidence "is to be believed and
all justifiable inferences are to be drawn in his favor."  Marino
v. Industrial Crating Co., 358 F.3d 241, 247 (3d Cir.
2004)(quoting Anderson, 477 U.S. at 255).

Initially, the moving party has the burden of demonstrating
the absence of a genuine issue of material fact.  Celotex Corp.
v. Catrett, 477 U.S. 317, 323 (1986).  Once the moving party has
met this burden, the nonmoving party must identify, by affidavits
or otherwise, specific facts showing that there is a genuine
issue for trial.  Id.  Thus, to withstand a properly supported
motion for summary judgment, the nonmoving party must identify

6

specific facts and affirmative evidence that contradict those offered by the moving party.  Anderson, 477 U.S. at 256-57.  A party opposing summary judgment must do more than just rest upon mere allegations, general denials, or vague statements.  Saldana v. Kmart Corp., 260 F.3d 228, 232 (3d Cir. 2001).

**B. § 1983 Claim Against the Borough of Woodlynne**

A municipality can be liable for claims brought pursuant to § 1983 if it is shown that a municipal policy or custom caused a constitutional injury.  See Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit, 507 U.S. 163, 166 (1993); Watson v. Abington Tp., 478 F.3d 144, 155 (3d Cir. 2007) (stating that liability for § 1983 must be founded upon evidence that the government supported a violation of constitutional rights) (citing Monell v. New York City Dept. of Soc. Servs., 436 U.S. 658, 691-95 (1978)).  To state a claim under 42 U.S.C. § 1983, the plaintiff must show that: (1) the conduct complained of was committed by a person acting under color of state law; and (2) that the conduct deprived him of his rights, privileges, or immunities secured by the Constitution or laws of the United States.  See, e.g., Shuman ex rel. Shertzer v. Penn Manor School Dist., 422 F.3d 141, 146 (3d Cir. 2005)(citing Mark v. Borough of Hatboro, 51 F.3d 1137, 1141 (3d Cir. 1995); Moore v. Tartler, 986 F.2d 682, 685 (3d Cir. 1993)).

There is no dispute that the ordinance passed by Council was

an official policy of the Borough or that the Borough was acting under color of state law.  Ragan alleges that in passing the ordinance the Borough denied him his right to free speech and due process in violation of the first and fourteenth amendments, respectively.

**1.    Protected Speech under First Amendment**

In his opposition, Ragan "concedes that due to recent Supreme Court rulings he no longer has a viable claim under the First Amendment."  Although Ragan does not cite to a case, defendants rely on Garcetti v. Ceballos, 126 S.Ct. 1951, 1960 (2006) for the proposition that if a public employee's speech is made pursuant to his official duties, such speech is not protected by the First Amendment.  Defendants argue that Ragan's criticisms of the Mayor involving himself in the daily operations of the department and involving himself in investigations concerning Hispanic citizens were made pursuant to his official duties as chief of police.  Ragan provides no opposition to defendants' argument on this issue.  We find that Ragan's speech is not protected under the Constitution and grant defendants' motion to dismiss his § 1983 claim with regard to his First Amendment rights.

**2.   Due Process Claim Under Fourteenth Amendment**

The parties do not dispute that Ragan as chief of police had a property interest in his continued employment protected by procedural due process considerations pursuant to the fourteenth amendment.  See <u>Perez v. Cucci</u>, 725 F.Supp. 209, 241 (D.N.J. 1989)(stating that the Third Circuit recognizes that police officers have a property interest in their employment that implicates the procedural due process protections of the fourteenth amendment) (citing <u>Gnioteck v. City of Phila.</u>, 808 F.2d 241, 244-46 (3d Cir. 1986), <u>cert. denied</u>, 481 U.S. 1050 (1987); <u>Copeland v. Phila. Police Dept.</u>, 840 F.2d 1139, 1145 (3d Cir. 1988), <u>cert. denied</u>, 490 U.S. 1004 (1989)).  The parties also do not dispute that Ragan retired on June 1, 2004.  The presumption is that resignations and retirements are voluntary. <u>Leheny v. City of Pittsburgh</u>, 183 F.3d 220, 227 (3d Cir. 1999). "If an employee retires of his own free will, even though prompted to do so by some action of his employer, he is deemed to have relinquished his property interest in his continued employment for the government, and cannot contend that he was deprived of his due process rights." <u>Id.</u> (citing <u>Hargray v. City of Hallandale</u>, 57 F.3d 1560, 1567 (11th Cir. 1995)(stating "[i]f he resigned of his own free will even though prompted to do so by events set in motion by his employer, he relinquished his property interest voluntarily and thus cannot establish that the

9

state 'deprived' him of it within the meaning of the due process clause.")(quoting <u>Stone v. University of Md. Medical Sys. Corp.</u>, 855 F.2d 167, 173 (4th Cir. 1988)).[2]

Although Ragan does not dispute that his retirement was voluntary, he argues that when Council passed the ordinance abolishing the position of chief of police, that act was a demotion and done in violation of his due process rights under the fourteenth amendment.  Therefore, the issue before the Court is whether Ragan has a property right attendant to his position as chief of police sufficient to implicate due process protections under the fourteenth amendment.

Property rights are created by state law.  See <u>Kelly v. Borough of Sayreville</u>, 107 F.3d 1073, 1077 (3d Cir. 1997) (citing <u>Clark v. Township of Falls</u>, 890 F.2d 611, 617 (3d Cir. 1989)). The state law implicated here is N.J.S.A. 40A:14-147, which states in part:

> Except as otherwise provided by law, no permanent member or officer of the police

---

[2]  A presumption of voluntariness can be rebutted if the employee can establish that his resignation or retirement was involuntary. <u>Leheny</u>, 183 F.3d at 227.  Involuntariness is shown: "(1) when the employer forces the resignation or retirement by coercion or duress, or (2) when the employer obtains the resignation or retirement by deceiving or misrepresenting a material fact to the employee." <u>Id.</u> at 228 (citing <u>Hargray</u>, 57 F.3d at 1568).  Ragan does not dispute that he voluntarily retired.  Rather, Ragan argues that defendants violated his procedural and substantive due process rights when he was stripped of his title as Chief of Police.

department or force shall be removed from his
office, employment or position for political
reasons or for any cause other than
incapacity, misconduct, or disobedience of
rules and regulations established for the
government of the police department and
force, nor shall such member or officer be
suspended, removed, fined or reduced in rank
from or in office, employment, or position
therein, except for just cause as
hereinbefore provided and then only upon a
written complaint setting forth the charge or
charges against such member or officer.  The
complaint shall be filed in the office of the
body, officer or officers having charge of
the department or force wherein the complaint
is made and a copy shall be served upon the
member or officer so charged, with notice of
a designated hearing thereon by the proper
authorities, which shall be not less than 10
nor more than 30 days from date of service of
the complaint.

The Superior Court of New Jersey interpreted the above
statute in Quaglietta v. Borough of Haledon, 440 A.2d 82, 84
(N.J. Super. 1981).  In Quaglietta, the governing body of the
Borough of Haledon adopted an ordinance eliminating the position
of chief of police and establishing the position of director of
police.  Prior to the enactment of that ordinance, Vincent
Quaglietta was the chief of police of Haledon and exercised sole
and complete control over the police department, subject only to
the governing body and its police committee.  Id.

The court in Quaglietta determined that N.J.S.A. 40A:14-147
was violated because the police chief was demoted.  Id. (finding
that portions of the ordinance pertaining to the director of

police to be legally invalid).  The court found that the
ordinance took control of the police department from the chief of
police and gave it to a police director.  Id.  Particularly, the
court found that Chief Quaglietta, who had formerly headed up the
department, would now be subject to "... the over-all control and
direction of the proposed police director."

     The facts in this case are similar to those in Quaglietta.
Like Quaglietta, Ragan was the chief of police and by ordinance
was stripped of that title and some of his former duties
reassigned.  Here, the Borough of Woodlynne passed an ordinance
eliminating the position of chief of police and creating the
position of "Director of Public Safety/Chief Law Enforcement
Officer."  The director/chief would be the head of the police
department and would be "... responsible with the Appropriate
Authority for the day-to-day operations of the police department
generally."  See Borough of Woodlynne Ordinance #7-2004.  The
language used in the ordinance suggests that control of the
department would have been taken from Ragan and vested in the
director/chief.  Although defendants argue that the position of
director/chief was "merely a civilian position created to work in
concert with the police department, not to run the police
department," the language of the ordinance clearly states that
sections of the Borough's police department ordinance would be
amended to "[d]elete all reference to the Chief of Police as the

head of the police department" and to amend those sections to
"... provide for a Director of Public Safety/Chief Law
Enforcement Officer as the head of the police department... ."
Also, Ragan's new title would have been lieutenant which suggests
a demotion in rank as well.  In addition, if it was intended that
control of the department be taken from the chief of police, such
an act could also be in violation of N.J.S.A. 40A:14-118 which
provides that if the position of chief of police is established,
the chief  "... shall be the head of the police force and ... he
shall be directly responsible to the appropriate authority for
the efficiency and routine day to day operations thereof ... ."[3]

   Although there was no decrease in Ragan's salary or
benefits, the ordinance suggests that Ragan was divested of
control over the police department, and the loss of title and
authority could amount to a demotion in violation of N.J.S.A.
40A:14-147.  Therefore, the act of abolishing the position of

---

   [3]  Defendants argue that since the statute provides that a
chief of police shall be the head of the police force only *if* the
municipality establishes such a position, that it can choose to
not only create the position, but also to eliminate it.  In
support, defendants quote Quaglietta, which stated "... the
governing body does have the legal authority to abolish the
office of police chief and to retake and assume those powers."
However, the very next sentence in Quaglietta, states,
"[h]owever, it cannot divest the functioning police chief of his
powers and then transfer them to another person known as the
"Director of Police... ."  In other words, it is not the
authority to abolish the position of police chief that it is at
issue – the Borough has that authority.  It is the effect of
stripping Ragan of his title and authority that implicates due
process considerations.

chief of police and creating the position of a director public safety/chief law enforcement officer who would have control over the police department raises genuine issues of material fact over whether such action violated Ragan's property interest as defined in the above New Jersey statutes without due process of law.[4] Although an issue arises as to what damages he has suffered - an issue we do not resolve now - Defendants' motion for summary judgment to dismiss Ragan's due process claims against the Borough is denied.

**C.    § 1983 Claim Against Mayor Fuentes (Legislative Immunity)**

Ragan also brings a § 1983 action against Mayor Fuentes individually. Defendants argue that the Mayor enjoys legislative immunity from Ragan's § 1983 suit because the actions by Mayor Fuentes of introducing and signing the ordinance eliminating the position of chief of police were legislative acts.

In <u>Bogan v. Scott-Harris</u>, 523 U.S. 44, 48-49, 54 (1998), the Supreme Court recognized the long standing principle that

---

[4] Defendants argue that since Ragan was present at the Council meetings culminating in the passage of the ordinance, that he had notice and opportunity to be heard as required for procedural due process considerations. Because we find that an issue is raised over whether Ragan was demoted in violation of N.J.S.A. 40A:14-147, the procedural requirements require that a written complaint setting forth the charge against the officer be filed in a particular office with specified service requirements. Ragan's presence at Council meetings would not meet this requirement.

legislatures are entitled to absolute immunity from liability for
their legislative activities and held that "local legislators are
likewise absolutely immune from suit under § 1983 for their
legislative activities."

In <u>Bogan</u>, after preparing his budget, the mayor introduced
an ordinance eliminating 135 city positions, including that of
the plaintiff's.  <u>Id.</u> at 47.  The plaintiff filed a § 1983 action
against the city, the mayor and other city officials.  <u>Id.</u>  She
alleged that the elimination of her position was racially
motivated and in retaliation against her for exercising her first
amendment rights regarding another employee who was politically
connected with city officials.  <u>Id.</u>

The Supreme Court found that the act of voting on an
ordinance was "quintessentially legislative." <u>Id.</u> at 55.  Also,
that the mayor's introducing the budget and signing an ordinance
into law were legislative acts because such actions were "...
integral steps in the legislative process."  <u>Id.</u>  The Court
determined that the ordinance in that case was legislative in
substance because it "... reflected a discretionary, policymaking
decision implicating the budgetary priorities of the city and the
services the city provides to its constituents."  <u>Id.</u>

An important distinction made by the Supreme Court in <u>Bogan</u>
was the difference between legislation that terminates a
particular employee, and legislation that abolishes a certain

15

position.  The Supreme Court found that the ordinance that
abolished plaintiff's position was a legislative act because it
had possible implications beyond the current holder of the
position. Id. at 56.  Conversely, an ordinance that serves only
to terminate an employee is not a legislative act.  See
Montgomery County v. Wright, 215 F.3d 367, 376 (3d Cir.
2000)(finding act of firing employee was not a substantive
legislative act entitled to absolute immunity).

In this case, the ordinance eliminated the position of chief
of police, but it did not terminate Ragan as an employee.  Ragan
continued in his employment and did not receive a reduction in
pay or benefits.  He also remained the highest ranking member of
the police department.  However, it appears Ragan was reduced in
rank and divested of complete control over the police department.
Also, Ragan argues that the ordinance was not passed for public
safety concerns in having more uniformed police patrolling the
streets, but was passed for the sole reason of removing Ragan.
This raises the issue of whether an ordinance that does not
terminate an employee but was passed with the alleged intention
of adversely affecting that person's employment is a "legislative
act."

Although this particular issue has not been decided, the
Third Circuit has provided some guidance in how to assess whether
an act is legislative.  In Baraka v. McGreevy, 481 F.3d 187, 198

16

(3d Cir. 2007), the Third Circuit applied a two part inquiry. The first part asks whether the act is substantively legislative. Id. "Legislative acts are those which involve policy-making decision [sic] of a general scope or, to put it another way, legislation involves linedrawing." Id. (quoting Gallas v. Supreme Court of Pennsylvania, 211 F.3d 760, 774 (3d. Cir. 2000)). "Where the decision affects a small number or a single individual, the legislative power is not implicated, and the act takes on the nature of administration." Id.  The second part of the inquiry asks whether the act is procedurally legislative. Id. A procedurally legislative act is "... passed by means of established legislative procedures." Id.

In Baraka, the plaintiff, Amiri Baraka, was appointed in 2002 by then Governor McGreevy to serve for two years as poet laureate of New Jersey, a position created by the New Jersey State Legislature in 1999. Id. at 193.  Two months after his appointment, Baraka publicly read a poem that prompted criticism as being anti-Semitic. Id. at 194. Governor McGreevy asked for Baraka's resignation but Baraka refused. Id. Shortly thereafter, the New Jersey State Legislature passed legislation abolishing the position of poet laureate, and Governor McGreevy signed it into law. Id.

Applying the two part inquiry, the Third Circuit found that the Governor's action was substantively legislative. Id.

17

Specifically, that the act of eliminating the legislatively created position of poet laureate was the type of policy-making that traditional legislation entails.  Id. (noting the distinction between legislation that abolishes a position and legislation that terminates an employee).  The Third Circuit also found that procedurally, the signing of the legislation was "quintessentially legislative."  Id. at 199 (relying on Bogan, 523 U.S. at 55).

Similar to this case, in Baraka, the plaintiff argued that the motivation behind passing the legislation was solely to remove him from the position.  Baraka argued that the Governor "orchestrated and directed" the legislature to abolish the position of poet laureate and that the effect of his removal "... is better analogized to the termination of an individual's employment than to the elimination of a position."  Id. at 197, 200.  The Third Circuit squarely rejected this argument.  In determining whether an act is legislative, the "relevant inquiry is whether 'stripped of all considerations of intent and motive, [defendants'] actions were legislative.'"  Baraka 481 F.3d at 200 (citing Bogan, 523 U.S. at 54); see also Youngblood v. DeWeese, 352 F.3d 836 (3d Cir. 2003)(finding defendant's alleged motive to punish plaintiff irrelevant where allocation of appropriations for office staffing among house members was legislative act to which immunity extended).  The Third Circuit did not take into

18

consideration Baraka's argument regarding the Governor's subjective intent and concluded that his action were, in form and in substance, legislative entitling the Governor to legislative immunity.  Id. at 200 (relying on the principal stated in Bogan that "it simply is 'not consonant with our scheme of government for a court to inquire into the motives of our legislature.'") (citing Bogan, 523 U.S. at 55, quoting Tenney v. Brandhove, 341 U.S. 367, 372 (1951)).

Stripping our inquiry of any alleged improper motivations by the Mayor, we apply the two part analysis to determine whether the introduction and signing of the ordinance that abolished the position of chief of police were legislative acts.  In order to determine whether the act is substantively legislative, we look to the policy-making power of the Borough.  The power to create the position of chief of police resides with the municipality pursuant to N.J.S.A. 40A:14-118.[5]  As pointed out in the previous

---

[5] The statute states in pertinent part:
The governing body of any municipality, by ordinance, may create and establish, as an executive and enforcement function of municipal government, a police force... .  The ordinance may provide for the appointment of a chief of police and such members, officers and personnel as shall be deemed necessary, the determination of their terms of office, the fixing of their compensation and the prescription of their powers, functions and duties, all as the governing body shall deem necessary for the effective government of the force.  Any such ordinance, or rules and regulations, shall provide that the chief of police, if such position is established, shall be the head of the

section, a municipality also has the legal authority to abolish
the office of police chief.  See n.3 supra; Quaglietta, 440 A.2d
at 85.  Although the power to abolish the position of chief of
police does not permit the governing body to divest the
functioning police chief of his powers and reassign them to
another individual in violation of state statute, and in this
case, in violation of Ragan's due process rights, the
municipality can abolish the position of chief of police
legislatively.  In other words, an ordinance introduced to
abolish the position of chief of police is within the power of
the municipality and the acts of introducing and signing such an
ordinance are substantively legislative acts.  See Baraka, 481
F.3d at 199.  It is the effect of stripping the incumbent police
chief of his power and assigning his former duties to a director
of public safety/chief law enforcement officer that is
potentially violative of Ragan's individual due process rights.

     As to the second part of the inquiry, Ragan has not alleged
that the process followed by the Mayor and Council was not
according to established procedure and we find that the process
of passing the ordinance was procedurally legislative.

     Thus, the Mayor's acts of introducing and signing the

---

          police force and that he shall be directly responsible
          to the appropriate authority for the efficiency and
          routine day to day operations thereof ... .
          N.J.S.A. 40A:14-118.

ordinance that eliminated the position of chief of police were substantively and procedurally legislative entitling him to legislative immunity and barring Ragan's § 1983 claim against Mayor Fuentes individually.

### D.  New Jersey's Conscientious Employee Protection Act

The New Jersey Conscientious Employee Protection Act ("CEPA"), N.J.S.A. 34:19-1, et seq., provides protection to "whistleblowers" from retaliation by their employer who report their employers' illegal activity.  See Reynolds v. TCM Sweeping, Inc., 340 F.Supp.2d 541, 545 (D.N.J. 2004) (citing Hernandez v. Montville Twp. Bd. of Educ., 808 A.2d 128 (N.J.Super. 2002)). "CEPA is remedial social legislation designed to promote two complementary public purposes: 'to protect and [thereby] encourage employees to report illegal or unethical workplace activities and to discourage public and private sector employers from engaging in such conduct.'" Dannunzio v. Prudential Ins. Co. of America, 927 A.2d 113, 120 (N.J. 2007)(citations omitted). "As broad, remedial legislation, the statute must be construed liberally."  Id.

It appears that Ragan is proceeding on a "pretext" theory of discrimination under CEPA which triggers a burden-shifting, three-step process.  See Kolb v. Burns, 727 A.2d 525, 530-31 (N.J. Super. 1999).  First, Ragan must prove a prima facie case of retaliation.  Id.  If he establishes a prima facie case, the

21

burden shifts to defendants to provide a non-retaliatory reason for the adverse employment decision.  Id.  Upon such a showing, the burden shifts back to Ragan to explain why defendants' reason is "pretext." Id.  In order to show the reason is pretext, Ragan "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them 'unworthy of credence,' and hence infer 'that the employer did not act for [the asserted] non-discriminatory reasons.'" Id. at 531 (citing Fuentes v. Perskie, 32 F.3d 759, 765 (3rd Cir. 1994) (citations omitted) (quoting Josey v. John R. Hollingsworth Corp., 996 F.2d 632, 638 (3rd Cir. 1993)).

In order to make a prima facie claim, "[a] successful plaintiff under CEPA must show four elements: (1) He reasonably believed that an activity, policy or practice of defendant, his employer, was in violation of a law, rule or regulation promulgated pursuant to law or was fraudulent or criminal; (2) He objected to or complained about the activity, policy or practice; (3) Retaliatory action was taken against him (i.e. adverse employment action occurred); and (4) There was a causal link between the plaintiff's action and the retaliatory or adverse action of the defendant employer." Reynolds, 340 F.Supp.2d at 545 (citing McCullough v. Atlantic City, 137 F.Supp.2d 557, 573

(D.N.J. 2001)).

Ragan argues that he can prove all of the above elements. First, Ragan states that the Mayor's action in approaching the lieutenant at a Municipal Court hearing and requesting that the parking ticket issued to the Hispanic female be dismissed was in violation of N.J.S.A. 40A:14-118 because the Mayor's duties do not extend to the judicial enforcement of the laws.  N.J.S.A. 40A:14-118 provides in relevant part:

> ... the chief of police, if such position is established, shall be the head of the police force and that he shall be directly responsible to the appropriate authority[6] for the efficiency and routine day to day operations thereof, and that he shall, pursuant to policies established by the appropriate authority:
>
> a.  Administer and enforce rules and regulations and special emergency directives for the disposition and discipline of the force and its officers and personnel;
>
> b.  Have, exercise, and discharge the functions, powers and duties of the force;
>
> c.  Prescribe the duties and assignments of all subordinates and other personnel;
>
> d.  Delegate such of his authority as he may deem necessary for the efficient operation of the force to be exercised under his direction and supervision; and
>
> e.  Report at least monthly to the appropriate authority in such form as shall

_____

[6] The term "appropriate authority" refers to the mayor.  <u>See</u> N.J.S.A. 40A:14-118.

> be prescribed by such authority on the
> operation of the force during the preceding
> month, and make such other reports as may be
> requested by such authority.

The statute goes on to provide that:

> Nothing herein contained shall prevent the
> appropriate authority ... from examining at
> any time the operations of the police force
> or the performance of any officer or member
> thereof. In addition, nothing herein
> contained shall infringe on or limit the
> power or duty of the appropriate authority to
> act to provide for the health, safety or
> welfare of the municipality in an emergency
> situation through special emergency
> directives.

Although N.J.S.A. 40A:14-118 does provide that the duties of the police chief will not prevent the Mayor's ability to examine at any time the operations of the police force or the performance of any officer or member, or to exercise his power or duty to provide for the health, safety or welfare of the municipality, Ragan has raised enough of a genuine issue of material fact as to whether his belief that the Mayor's action in asking that the ticket be dismissed contravened the statute.  This is not to suggest that the Mayor's action did violate the statute, only that a jury could find Ragan's belief in the violation to be reasonable.

Defendants argue that Ragan cannot prove the first element of his prima facie case because his affidavit submitted in opposition to summary judgment is a "sham affidavit."  See In re

<u>CitX Corp., Inc.</u>, 448 F.3d 672, 679 (3d. Cir. 2006) (stating that the term "sham" "refers to the trial courts' practice of disregarding an offsetting affidavit that is submitted in opposition to a motion for summary judgment when the affidavit contradicts the affiant's prior deposition testimony.")(citing <u>Baer v. Chase</u>, 392 F.3d 609, 624 (3d Cir.2004); <u>Shelcusky v. Garjulio</u>, 797 A.2d 138, (N.J. 2002)(same)).  Specifically, defendants argue that statements made in the affidavit contradict Ragan's deposition testimony in which he testified as follows:

> Q.  Okay.  And when you refer to things he wanted to do that you took issue with, did you feel those things were in violation of the Woodlynne Police Department's internal policies and procedures?
>
> A.  I felt they interfered with the chain of the command in the operations of the department.
>
> Q.  Was there anything that he did that you felt was illegal?
>
> A.  No.
>
> Q.  How about unethical?
>
> A.  I would say improper, I don't know about unethical.
>
> Q.  That you found improper?
>
> A.  Him interfering with the courts.
>
> Q.  And interference with the court is what you already described for us, right?
>
> A.  Right.
>
> Q.  Any other instances?
>
> A.  No, from what I can recollect.

Defendants compare the above testimony with the statements made in Ragan's affidavit:

> I firmly believed that a Mayor,...has

25

> absolutely no business interfering in the
> disposition of charges pending in the
> municipal court.  Where pending charges are
> dismissed at the behest of a Mayor or a
> member of the government, the integrity of
> the court in the eyes of the public can only
> be diminished.  I know of no law that invests
> in a Mayor or other elected municipal
> official a right to grant clemency to persons
> accused of violating the law.

An affidavit can be disregarded if it flatly contradicts prior sworn testimony.  See Martin v. Merrell Dow Pharmaceuticals, Inc., 851 F.2d 703, 705 (3d Cir. 1988) (affirming district court's disregard of plaintiff's affidavit submitted after facing almost certain defeat in summary judgment that flatly contradicted no less than eight of her prior sworn statements.).  However, an affidavit can be acceptable if serves to correct prior testimony where "... the witness was confused at the earlier deposition or for some other reason misspoke."  Id. (citing Lane v. Celotex Corp., 782 F.2d 1526 (11th Cir. 1986)).

The subject matter testified to by Ragan at deposition is central to the first element of his CEPA claim – whether he reasonably believed that an activity, policy or practice of his employer was in violation of a law, rule or regulation.  We cannot say as a matter of law, however, that the affidavit flatly contradicted the earlier testimony.  Unlike in Martin, Ragan was not repeatedly asked about his belief in the legality of the Mayor's behavior.  Also, the language in the affidavit could

26

support Ragan's earlier statement that Mayor's actions were improper.  See Gray v. City of Camden, No. L-476-04, 2007 WL 1891613, at *3 (N.J.Super. July 03, 2007) (finding that plaintiff's statement that he knew the leaking cans in the boxes he was loading were flammable did not contradict his prior statements that he was unaware of what was in the boxes; rather it conveyed his knowledge that leaking cans are flammable).

In any event, it appears that Ragan's deposition testimony compared with the statements in the affidavit are more appropriately dealt with on cross-examination than on summary judgment.  See In re CitX, 448 F.3d at 680 (concluding that cross-examining an affiant in a later deposition to be the better way to find flaws in a bogus affidavit) (relying on 10B Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2738, at 334-35 (3d ed. 1998)).  Therefore, we decline to disregard Ragan's affidavit as a sham.

As to the second element, Ragan has stated that he approached the Mayor directly and objected to the Mayor's request to the lieutenant that the ticket issued to the Hispanic female be dismissed.  It seems clear from the record that Ragan was vocal in his opposition to the Mayor about the Mayor's directives satisfying the requirement that he object to or complain about the activity, police or practice.

The elimination of Ragan's position suggests a demotion in

27

rank that qualifies as an adverse employment decision satisfying the third element.  Finally, the dismissal of the ticket occurred in January 2004, and in early March 2004, the Mayor introduced the ordinance abolishing the chief of police position.  This suggests a causal link between the incidents and the adverse employment action to withstand summary judgment.

Finding that Ragan has made a prima facie case under CEPA, the burden now shifts to defendants to offer a legitimate, non-retaliatory reason for the adverse employment action.  Kolb, 727 A.2d at 531.  Defendants state that the reason the position of chief of police was eliminated was due to safety concerns. Particularly, defendants argue that when Mayor Fuentes requested that Ragan patrol in order to have more uniformed police on the streets, Ragan refused on the ground that his administrative duties took up too much of his time.  Defendants state that Mayor Fuentes proposed the ordinance eliminating the position of chief of police and establishing a director of public safety/chief law enforcement officer, a civilian position, to handle the administrative functions of the department and allow Ragan more time patrolling the streets.

Ragan argues that defendants' reason is pretext because before the incident involving the dismissed ticket occurred, the issue of putting more uniformed officers on the streets was being pursued through the hiring of special officers.  Ragan also

28

argues that the ordinance was more singular in its purpose – to get rid of Ragan – than as a method to improve the visibility of police officers in the Borough.  Ragan also attacks any concern by the defendants over the Borough's finances as a reason for the ordinance since it provided for the additional position of director of public safety/chief law enforcement officer.

We find that Ragan has pointed to sufficient evidence to support an inference that defendants acted for reasons other than their proffered reason.  Ragan has demonstrated that if the object was to put more uniformed officers on the street, something other than an ordinance that abolished the chief of police position and would presumably result in only one additional uniformed officer patrolling the street might be more appropriate.  Thus, defendants' motion for summary judgment regarding plaintiff's CEPA claim is denied.

**E.   Punitive Damages**

Defendants move to dismiss plaintiff's claim for punitive damages.  Defendants argue that Ragan cannot as a matter of law maintain a punitive damages claim with respect to his § 1983 action.  See City of Newport v. Fact Concerts, 453 U.S. 247, 271 (1991) (holding that "... a municipality is immune from punitive damages under 42 U.S.C. § 1983.").  Ragan does not contest this statement.  The Court agrees and finds the law is clear that punitive damages are not recoverable under Ragan's 42 U.S.C. §

1983 action.  See id.; Gregory v. Chehi, 843 F.2d 111, 119-20 (3d Cir. 1988).

Defendants also move to dismiss Ragan's punitive damages claim with regard to his CEPA claim.  They argue that Ragan cannot show that defendants engaged in egregious acts or acted with willful or wanton disregard or actual malice because defendants had a legitimate non-discriminatory reason for eliminating the chief of police position.[7]

Under New Jersey law, punitive damages are awarded in instances where:

> ... the plaintiff proves, by clear and convincing evidence, that the harm suffered was the result of the defendant's acts or omissions, and such acts or omissions were actuated by actual malice or accompanied by a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions.  This burden of proof may not be satisfied by proof of any degree of negligence including gross negligence.

N.J.S.A. 2A:15-5.12.

Defendants argue that since they proffered a legitimate, non-retaliatory reason for eliminating the position of chief of police, that their actions do not rise to the level of wanton

---

[7]  Defendants also argue that they cannot be liable for punitive damages because Ragan voluntarily retired.  As discussed above, the focus is on the elimination of the chief of police position, which occurred prior to Ragan's retirement.

disregard or actual malice.  Ragan counters that punitive damages may be appropriate since the introduction of the ordinance followed receipt of the February 6, 2004 letter from the Borough solicitor regarding plaintiff's legal rights in his position as chief of police.  Ragan maintains that the introduction and passage of that ordinance was a deprivation of the rights delineated in the solicitor's letter.  Ragan argues that a jury could conclude that the actions taken by the Mayor were punitive in light of his having been advised of Ragan's legal rights before he introduced the ordinance.

The Court finds that Ragan has raised enough of a genuine issue of material fact so that the issue of punitive damages as to his CEPA claim should not be taken from the jury.  See Nappe v. Anschelewitz, Barr, Ansell & Bonello, 97 N.J. 37, 49 (1984) (stating, "[o]ur cases indicate that the requirement [for punitive damages] may be satisfied upon a showing that there has been a deliberate act or omission with knowledge of a high degree of probability of harm and reckless indifference to consequences.").  We cannot say as a matter of law that no reasonable jury could find that the actions taken in eliminating the position of chief of police, following advice from counsel as to the legal rights enjoyed by someone in that position, did not amount to a wrongful intentional act or a wanton and wilful disregard of Ragan's rights.

31

## III.   <u>CONCLUSION</u>

For the foregoing reasons, defendants' motion for summary judgment is granted in part and denied in part. An Order consistent with this Opinion will be entered.


                            <u>    s/Noel L. Hillman       </u>
                             NOEL L. HILLMAN, U.S.D.J.

At Camden, New Jersey

Dated: September 28, 2007